THE STATE v. ROBERT PRIVETT, Appellant.—152 S. W. (2d) 73.

Division Two, June 10, 1941.

*Corbett & Peal* for appellant.

*Roy McKittrick,* Attorney General, and *Olliver W. Nolen,* Assistant Attorney General, for respondent.

BOHLING, C.—Robert Privett appeals from a judgment imposing a sentence of fifteen years' imprisonment for second degree murder. See State v. Privett, 344 Mo. 1020, 130 S. W. (2d) 575, for opinion on first appeal.    He, Cleve Crow, Amiel Ring and Arnold Tucker

were charged jointly with the murder of N. C. Teroy by beating him on the head at Skinner's night club on Highway 84, in Pemiscot County, Missouri. [Consult State v. Ring (Banc), 346 Mo. 290, 141 S. W. (2d) 57; State v. Crow (Banc), 346 Mo. 306, 141 S. W. (2d) 66.] The points presented may be disposed of by ruling on the sufficiency of the evidence and the competency of certain evidence.

Appellant contends that Teroy's death was not the result of the assault at Skinner's but the result of Teroy being struck by Luther Gillam's automobile on Highway 84 a few hours later. He presents the issue on the evidence most favorable to him. The State, having prevailed *nisi*, is entitled to have the evidence favorable to the prosecution considered on review. Appellant's brief states the evidence was substantially the same as set out in the opinion handed down on the first appeal with the exception that the testimony of Claud Parnell was admitted at this trial. The first judgment, imposing a life sentence, was reversed and the cause remanded because this testimony had been excluded. We think the testimony for the State was more substantial on the second trial. In view of appellant's admission, the facts here stated are to be supplemented by a consideration of the facts found in the opinion on the first appeal.

The trouble started with Teroy and Crow engaging in a fight at Skinner's night club about midnight of May 22, 1938. Teroy died the next day. They were separated. Crow struck at Teroy. Teroy evaded the blow and chided Crow for missing. Someone warned that Crow had a knife. Teroy asked that both be searched, stating he would "fight him fair." Ring encouraged Crow and made a demonstration against Teroy, who shoved him back. Appellant, who served as "bouncer" at the night club, interfered; picked up a seasoned Elm limb (3 to 4 feet long and as thick as a man's wrist, with stubs of cut-off branches projecting therefrom); called to the others to aid (saying: "Let's get him gang. Let's kill the s— of a b—"); and chased Teroy back of a cabin. Teroy ran into a wire fence in the rear of the cabin. There is ample testimony from eye witnesses warranting a finding that appellant struck Teroy several times with the club, which was split when appellant returned. In fact, appellant is quoted by witnesses as having said after the affray that he had hit Teroy three or four times, knocked him out of the fence, knocked him down three times; that he broke the club across Teroy's head; that they would not be bothered with Teroy anymore, et cetera. Teroy broke through or managed to get over the fence and escape.

Sometime thereafter, estimated about 3:00 A. M., Teroy aroused Mr. and Mrs. Pelt, asking for help. The Pelts lived on Highway 84 about 1¼ miles west of the night club. Mr. Pelt instructed Teroy to go to Mr. Stout's a very short distance east of the Pelt's home. Next, Teroy aroused Mr. and Mrs. Stout. The Pelts and the Stouts were never close enough to observe Teroy. They readily understood

him and what he wanted—that he had been beaten, cut, was bleeding to death, and wanted help. Their narrative of Teroy's conversation showed Teroy to be logical. Mrs. Stout testified he had an impediment in his speech as if his mouth were "full of slobber;" that when he departed, he was staggering or wobbling. The opinion on first appeal is referred to for other facts occurring at the Pelt's and Stout's residences. Teroy then proceeded west along Highway 84.

Luther Gillam was operating his automobile east along Highway 84. He testified his automobile struck a man, later ascertained to be Teroy, about 1¼ miles west of Skinner's night club; that he stopped in about 25 feet, backed up, and, with the aid of persons riding in a taxi which drove up behind his automobile, put Teroy in his car. This was about a quarter mile west of Stout's residence. Gillam took Teroy to Hayti and then to Blytheville, Arkansas.

Mr. Gillam testified that he was driving 50 to 60 miles an hour when he first saw Teroy; that the lights on his car were in good shape; that at the previous trial, he testified he saw Teroy when 400 to 500 feet away and applied his brakes; that he was driving 20 to 30 miles an hour when he struck Teroy; that Teroy was approaching him; that the right front fender of his automobile struck Teroy's right hip a glancing blow; that Teroy traveled about 10 feet after the impact, and that his fender had a dent 2 inches deep, 8 inches wide and 13 inches long on the inside, not the outside, of the fender. He described the accident in one part of his testimony as follows: "I was coming from Kennett, going towards Hayti and I met Mr. Teroy walking up the center of the highway. He was staggering. I cut to the left to try to go around him. When I cut to the left he staggered over there. As he did that I cut my car back to the right and my right front fender hit him." At another: That when he saw Teroy approaching and staggering, he pulled to the left; that Teroy pulled to Teroy's right; that Gillam whipped the automobile to the south (Gillam's right) and the right front fender struck Teroy. At another: "I met him coming up the highway. I swerved my car to the right. He staggered to the left. I cut my car back and it [having reference to the right front fender] hit him."

Harvey Smith testified he was driving his taxi a short distance behind the Gillam car, traveling 45 miles an hour; that he saw the tail light on Gillam's car flash up and the car stop; that he did not see it back up, and that the back end of Gillam's car was even with Teroy's body.

Claud Parnell, whose testimony is stressed by appellant, testified that he was driving his automobile on Highway 84 on the night in question; that a few minutes before 1:00 A. M. he was "flagged" by a man who gave his name as Teroy or Leroy; that he stopped and the man came to his car and put his face up to the open door on his side; that he noticed no blood on the man's face or person; and that he thought the man "was a Saturday night drunk."

We have set forth sufficient of the record to show that the credibility of witnesses Parnell and Gillam and the weight to be accorded their testimony was for the jury.

Dr. L. Hubener of Blytheville, Arkansas, described Teroy's injuries as a deep fracture of the glabella, lower frontal region, large enough to insert a finger; fracture of all the nasal bones; separating fracture of the maxilla; a fracture of the lower mandible; and a badly lacerated tongue. He testified these injuries were very probably caused by a club and it was very unlikely that they were the result of an auto-mobile accident. Dr. A. G. Shirley of Hayti, Missouri, who sent Teroy to the hospital at Blytheville, was of opinion Teroy did not receive his injuries from an automobile accident. There was testimony pro and con on the ability of one in Teroy's condition to walk. See also opinion on first appeal. Teroy's father testified all of his son's front teeth had been knocked out.

Against appellant's theory that Teroy's staggering was the result of intoxication stands the evidence that he was giving an excellent account of himself in his encounter with Crow; that he avoided being struck by Crow and chided Crow for missing; that his conversation at the fight was that of a sober man able to take care of himself; that he was escaping his pursurers when he ran into the fence in the dark; and that his conversation with the Pelts and Stouts was intelligent. Appellant's witnesses, if believed, had Teroy reeking of liquor. Dr. Shirley testified that Teroy did not have liquor on his breath. Dr. Hubener's testimony that Teroy vomited some material that smelled considerably of liquor does not establish that he was staggering drunk. Mrs. Stout testified she watched Teroy from the time he left her home until the two cars stopped on the highway; and that the next morning she found some blood where Teroy had been standing in her yard. The shoulder of the highway where Teroy was picked up was "grassy," no rocks. Teroy's face and mouth were free of dirt and gravel. The testimony established that, immediately after Gillam and Smith stopped, there was some fresh blood on the grass under-neath Teroy's head, but he had blood over the front of his clothes, including his trousers, and the blood on his clothing was not fresh and warm but crusted and dried; and he had a coagulated blood clot protruding from his mouth. Although several persons testified to looking carefully over the place where Teroy lay, there is no testimony of any teeth being found there. We think, as we held before, that the facts were for the jury, and that the instructions submitting the State's case were supported by substantial evidence. Appellant's theory was appropriately submitted.

When Crow, Ring, Tucker and appellant returned from back of the cabin, Crow said: "Let's go find him and finish him up." Crow backed his car out and the others got in. They drove east on the highway; were gone 15 or 20 minutes; returned, and then went

west on the highway. The assignment does not designate the testimony of any particular witness and several testified to like effect. Appellant complains of the remark attributed to Crow on the ground there was no conspiracy between Crow, Ring, Tucker and appellant to injure Teroy. The State's evidence established that they were acting together.

Crow testified on behalf of appellant. He said he did not go back of the cabin and did not know what happened, and did not know that Teroy had been hurt. The State, having laid the foundation in its cross-examination of Crow, proved that Crow, when informed the following morning that Teroy had been hit by a car, had said: "My God, I was getting ready to leave the country." No objection was interposed until after the witness had answered and there was no motion to strike. The objection was not sufficiently timely to preserve the error, if error. [State v. Albritton, 328 Mo. 349, 364, 40 S. W. (2d) 676, 680[8]; State v. Buckner (Mo.), 86 S. W. (2d) 167, 170[12]; State v. Demaggio, 152 S. W. (2d) 71, of even date herewith.] We think the inquiry proper for impeachment purposes.

Appellant does not question the record proper. We find no reversible error therein.

The judgment is affirmed. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.